CHASEZ, Judge.
This is an appeal from a judgment of the Twenty-Fifth Judicial District Court for the Parish of St. Bernard in which plaintiff-appellant, Bud C. Alford’s claim for Workmen’s Compensation was denied. Suit was originally brought in the Twenty-Second Judicial District Court for the Parish of St. Tammany, but was transferred to the Twenty-Fifth Judicial District Court for St. Bernard Parish by order of the Twenty-Second Judicial District Court on exceptions to the jurisdiction filed by appellee.
The petition of plaintiff-appellant alleged that he suffered two heart attacks while acting within the scope and course of his employment for defendant-appellee, Kaiser Aluminum & Chemical Corporation, (Kaiser) which attacks totally and permanently disabled him; that the attacks arose out of and were caused by the work performed by him for Kaiser. He alleged that the first attack occurred on November 12, 1964 and the second on March 8, 1965, and that the attacks occurred because of his exposure to extreme heat while engaged in the course of strenuous labor at defendant-appellee’s aluminum reduction plant at Chalmette, Louisiana.
Defendant-appellee denied that Alford suffered any heart attack or even an “accident” within the intendment of the Louisiana Workmen’s Compensation Statute but instead suffers from arteriosclerosis, a non-compensable disease.
An additional issue raised by plaintiff-appellant is whether or not defendant should be compelled to answer certain interrogatories propounded by plaintiff Alford or certain requests for admission of fact addressed to defendant Kaiser by appellant. These interrogatories and requests for admission of facts were asked for by plaintiff during the discovery stage of this lawsuit. *374 Defendant denied the relevancy of these requests and refused to answer them.
An issue raised for the first time on appeal is whether or not a Motion to Strike filed by defendant-appellee should be granted, which Motion seeks to strike certain information contained in plaintiff-appellant’s brief to this court. The material sought to be stricken is contained in a newsletter issued by Local 13000 of the Union to which Mr. Alford belonged. The Motion to Strike was submitted before this court in oral argument.
The lower court gave no written reasons for its judgment but denied plaintiff’s claim for Workmen’s Compensation and dismissed his suit from which judgment plaintiff Alford has prosecuted this appeal.
Our initial consideration will be directed toward the Motion to Strike filed by appel-lee. The grounds for the motion are that the material was presented for the first time on appeal, was not an exhibit, and formed no part of the transcript or record lodged in this court. Appellant in his answer to the Motion to Strike argued, and rightly so, that this was in no way any effort to supplement the transcript but was merely supportive of appellant’s brief and forms a part of his argument. We agree with appellant and therefore deny the Motion to Strike with the added statement that the newsletter being only a portion of appellant’s brief will be given no greater or lesser consideration than any other argument urged by appellant in his brief.
The next issue concerns whether or not the defendant-appellee should have been compelled to answer either the interrogatories propounded by plaintiff or the requests for admission of facts filed by plaintiff. In both the interrogatories and the request for admission of facts plaintiff sought to elicit information from Kaiser as to whether certain other individuals who worked under similar circumstances as plaintiff had suffered heart attacks. Defendant refused to answer these questions on the ground that they were irrelevant to the case at hand.
Article 1491 of the Code of Civil Procedure has reference to interrogatories of parties and states that interrogatories may relate to any matters which can be inquired into under Article 1436 of the Code of Civil Procedure. Article 1436 of the Code of Civil Procedure states in pertinent part; “* * * [T]he deponent may be examined regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action * * It necessarily follows that interrogatories are limited to matters relevant to the case under consideration.
Article 1496 of the Code of Civil Procedure relates to requests for admission of facts and states in part that:
“After commencement of an action a party may serve without leave of court upon any other party a written request for the admission by the latter of the genuineness of any relevant documents described in and exhibited with the request or of the truth of any relevant matters of fact set forth in the request.”
By definition of Article 1496 the matters must be relevant.
Plaintiff in interrogatories numbered 38 through 46 wanted to know if various other employees who worked under similar conditions as plaintiff had suffered any heart attacks. The same information was sought in requests for admission of facts numbered 20 through 28 and 30 through 37. The trial judge at hearings prior to the trial on the merits relieved the defendant Kaiser from the obligation of answering these questions for reason that they were not relevant. The trial judge has very broad discretion in limiting the scope of interrogatories which are propounded and to make such orders to protect the party to whom the interrogatories are propounded from annoyance, embarrassment, oppression or undue expense. LSA- *375 C.C.P. art. 1452; Dawson v. Lindsey, 143 So.2d 150 (La.App. 1st Cir. 1962). Unless there was grave error in the judgment of the trial judge it should not be set aside. We do not find that the trial judge abused his discretion. We agree that whether other employees had heart attacks or not does not go towards proving that the plain-. tiffi in this case suffered a heart attack. We therefore affirm the lower court in not compelling the defendant to answer the interrogatories or requests for admission of facts insofar as they relate to other employees.
It goes without question that a heart attack is a compensable injury if suffered while in the scope of employment and if it arises out of the employment. Danziger v. Employers Mutual Liability Ins. Co. of Wis., 245 La. 33, 156 So.2d 468 (1963) and cases cited therein. The only question posed before the trial court was whether in fact the plaintiff, Bud C. Alford, did indeed suffer a heart attack. The record reflects that his job as an anode man required him to work in an area where the temperatures were unusually high. His duties entailed opening the door to an aluminum reduction pot, extending his arms and upper body into the pot while standing on a flex board, which was a board extending into the pot with one end resting on the crust of the molten aluminum. He would then use a wrench to loosen a large nut which held a flex strip into place, a flex strip being a strip attached to an anode which supplied electricity for the reduction process. The anode was slowly lowered into the aluminum ore which necessitated a periodic raising of the flex strip to keep it free from the aluminum ore being reduced in the pot. The anode man would raise the flex strip to the next attachment and replace the nut. This process required an above average amount of exertion and took from 4 to 15 minutes to accomplish and had to be done at fairly short intervals. Under this factual situation if Bud Alford suffered a heart attack in the performance of his duties he is certainly entitled to compensation.
The testimony and evidence show that on November 12, 1964 Alford went to the first aid station at Kaiser complaining of a tenderness and pain and a lump in his right breast. No doctor was present at the aid station but the attendant advised him to see his personal physician. Alford returned to work and finished his shift, some two hours later, and went home. The next day, the 13th of November, was his day off and he went to see his personal physician, Dr. Jack Diamond. Dr. Diamond examined Mr. Alford and scheduled him for surgery on the 15th of November for removal of the lump in his breast. Mr. Alford worked all day on the 14th and 15th with Dr. Diamond’s approval and reported to the hospital on the evening of the 15th after getting off work. On entering the hospital a series of routine examinations was taken preparatory to surgery, among which was an electrocardiogram. The conclusion reached by Dr. Diamond on reading the EKG was that Mr. Alford had suffered a recent but healing myocardial infarction. However, during Mr. Alford’s stay in the hospital, a period of only 10 days, he was allowed to be completely ambulatory, was given a barium enema and doses of cod-liver oil, all of which can hardly be said to be the treatment prescribed for a heart attack patient.
Plaintiff was released from the hospital on November 25, 1964. He did not attempt to return to work until March 4, 1965 when he was placed on light duties under a program employed by Kaiser for workers who can no longer perform their regular tasks because of either injury or illness. Mr. Alford was assigned to driving a mechanical sweeper which entailed his steering the machine and using only an accelerator type pedal to propel the sweeper. His duties were to sweep up the aluminum dust and dirt that accumulated about and between the aluminum reduction pots. After four days, or on the 8th of March, 1965, plaintiff complained of nose bleeds, breathing difficulty and dizziness. This was the last day Alford worked for Kaiser.
*376 Neither Dr. Diamond or plaintiff’s other physician, Dr. Howard, appeared at trial; their depositions were introduced as plaintiff’s evidence. Their depositions were to the effect that plaintiff had suffered a myocardial infarction and was unable to return to work after the attacks on November 12, 1964 and March 8, 1965. It is interesting to note that in his original medical report Dr. Diamond referred to the nature of the illness as myocardial infarction but thereafter in all subsequent reports referred to the illness as coronary artery insufficiency.
The medical experts used by defendant Kaiser were Dr. Samuel Nadler and Dr. Donald Meyer. Dr. Nadler was admitted as an expert in internal medicine and cardiology. After studying a series of EKG’s made on Alford ranging in time from before the first alleged heart atack until after the second alleged attack, Dr. Nadler testified that it was his opinion that Alford had not suffered a myocardial infarction but suffered “rather widespread arteriosclerosis in his blood vessels” (Tr. pp. 278-281) and did not demonstrate any condition other than the usual, expected course of a rapidly advancing arteriosclerosis. Dr. Nadler testified that arteriosclerosis is a narrowing of the arteries which results in a lessening of the blood supply of the heart, that when there is a demand by the heart for more blood than can be brought to it by the narrowed arteries, the patient may develop symptoms that are suggestive of angina pectoris or discomfort in the chest. (Tr. pp. 282-283.) But it was Dr. Nadler’s testimony that exertion neither accelerated nor aggravated the arteriosclerotic condition of Mr. Alford.
With regard to whether Bud Alford suffered a heart attack Dr. Nadler was asked directly:
Q. “Now, Dr. Nadler, in your review of the medical records in regard to Mr. Alford, did you find any substantiation for the fact or allegation that Mr. Alford may have had a myocardial infarcs or death of heart tissue ?
A. “The answer to this is no. I can almost surely say that he did not have a myocardial infarction.”
On explaining the nature of a myocardial infarction Dr. Nadler testified:
“THE WITNESS:
“Infarction — i-n-f-a-r-c-t-i-o-n.
“Now, if a man has a myocardial infarction, it will manifest itself in one of several ways that can be diagnosed clinically. Probably the most valuable method is the electrocardiogram.
“And just by way of reinforcing my previous statement, I have examined maybe 10 or 15 electrocardiograms on this man, and nowhere in those tracings is there anything that even suggests myocardial infarction.”'
Dr. Nadler further testified at pp. 115— 116 of the record.
BY MR. JORDAN:
Q. “From your review of the records of Mr. Alford which includes the electrocardiogram of July 25, 1964, and runs through the July of 1965 electrocardiogram, is it your opinion that his condition has not measurably altered during that period of time?
A. “I’m going to answer that—
Q. “Let me narrow it down a little bit in relation to his heart.
A. “Well, I would — let us say I’ll give my answer first and then I’ll have to clarify it for the sake of clarity of the record.”
THE COURT:
“Yes, go ahead.”
THE WITNESS:
“My answer is, there’s no concrete evidence that there’s any deteriora *377 tion in the cardiac status. But remember I have only one thing to go by and that is the series of electrocardiograms. And judging from these tracings which in a measure is fairly accurate, judging by these tracings, there has not been a worsening of his electrocardio-graphic picture during that entire period of time. And I can say that there have been times in there when the electrocardiograms have been so close to normal in my opinion they can be classified as normal.
“I can also say that there’s been no evidence that I can make out of death of heart muscle in this patient.
Q. “Now, doctor, with the number of electrocardiograms spanning the period of time that you have reviewed, if there had been any permanent damage or myocardial infarction, isn’t it probable that that number of electrocardiograms would have revealed such a change ?
A. “Mr. Jordan, the answer to that is yes, and I can uniquivocably, judging from the hospital records with enzyme studies, and judging from these electrocardiograms, I am very firm in my statement that there’s no evidence in these records of any damage to heart muscle.”
On cross examination by counsel for plaintiff in relation to whether Dr. Diamond’s reading of the EKG coincided with Dr. Nadler’s, Dr. Nadler’s testimony was as follows:
Q. “All right now then, let me ask you—
A. “Wait, I haven’t finished. Now, I say it is not. I say he has not damaged his heart muscles so far as we can tell from these electrocardiograms and his enzyme studies. And I am sticking straight to this fact. It is a fact — ”
THE COURT:
“In other words, you might go examine him now, and he might have that but according to what you’ve seen he doesn’t; is that what you tell me?”
THE WITNESS:
“Yes.”
THE COURT:
“All right, there you are, Mr. Ponder.”
BY MR. PONDER:
Q. “And he may have had it when these other doctors examined him, but you weren’t — •
A. “Well, Mr. Ponder, we have documentation here that’s probably 98 to 95 percent correct. And this documentation screams at me ‘He has not had death of heart muscle.’ Now, that’s all I can tell you.
Q. “And if other doctors say that he did, then you disagree with the other doctors ?
A. “I’d say yes with this qualification, if they make that diagnosis on the same day as I have here and that is the only date they have, then they are wrong. He did not have death of heart muscle.”
It can be seen from this testimony that Dr. Nadler was emphatic and unequivocal in his position that Mr. Alford had not suffered a heart attack but suffered from the disease arteriosclerosis.
Dr. Meyer was accepted as an expert in the field of cardiology and he testified that he read some 18,000 EKG’s a year at Touro Infirmary and another 18,000 to 20,000 per year at Charity Hospital in New Orleans. Dr. Meyer reviewed all of the records of Mr. Alford and he to testified that these records did not reveal any evidence in terms of heart damage or of prior myocardial infarction.
*378 On direct examination by counsel for defendant Dr. Meyer’s testimony was as follows:
BY MR. JORDAN:
Q. “Did your examination, Dr. Meyer, of the entirety of all of these electrocardiograms reveal to you that Mr. Alford had suffered any heart damage?
A. “I don’t see evidence here in terms of heart damage of a prior myocardial infarction.”
MR. PONDER:
“Wait, I didn’t — ”
THE WITNESS:
“Prior myocardial infarction.”
MR. JORDAN:
“He sees no evidence in the record.”
When asked what his examination of the EKG’s did reveal, Dr. Meyer testified:
BY MR. JORDAN:
Q. “Would you state to the Court what your examination of these electrocardiograms revealed to you as an expert in the field, as to the condition of Mr. Alford’s heart during that period of time?
A. “The condition of his heart as reflected in this record or series of tracings reveals the presence of some non-specific changes in the T wave patterns, which are consistent I believe, with some element of arteriosclerosis.
“I see no evidence here to support a diagnosis of a prior or recent true myocardial infarction.
Q. “Now, when you say ‘recent myocardial infarction, ‘and you’re looking at any particular E.K.G., how much time prior to taking of the E.K.G. are you talking about?
A. “Well, let us approach it from this standpoint, if a patient complains or came into my office with complaints of chest pains, say, three, four days ago or even two days ago, perhaps even as brief of 12 hours, but within a range of 12 to 72 hours, I would suspect that one would see clear elec-trocardiographic changes if he indeed had death of heart muscle tissue due to a coronary thrombosis.
Q. “Would you clarify ‘recent’? As long ago before the E.K.G. was taken as two weeks?
A. “Yes.”
Q. “And you find no evidence in any of these E.K.G.’s that you examined of a recent myocardial infarction ?
A. “I do not.
Q. “Now, those E.K.G.’s, you stated, present signs of non-specific T wave changes. Just what kind of a condition does that reflect ?
A. “I think statistically in a large number of cases this reflects the existence of some degree of narrowing of the coronary arteries, though many other factors can produce a pattern of this sort. In a single electrocardiogram, a heavy meal or perhaps fasting might even present such a pattern. That would be reversed, of course, with the reversal of the situation. Most of the time, though, these changes are due to some underlying arteriosclerosis involving the coronary arteries.
Q. “Now, in your examination of those electrocardiograms that you have testified to and the hospital records that you’ve testified to, what would you say was the underlying cause of the non-specific changes that you have found and testified to and those electrocardiograms ?”
*379 MR. PONDER:
“Now again, if your Honor please, .we’re getting into the realm of hypothesis as to what may have happened as distinguished from what did happen in this particular case. And I’m going to make the objection that this is irrelevant and immaterial.”
THE COURT:
“I’m going to overrule your objection. Let him rephrase the question so as to bring it within his appraisal of the documents.”
MR. JORDAN:
“I did that in the question.”
THE COURT:
“Just rephrase it again, Mr. Jordan.”
BY MR. JORDAN:
Q. “All right, Dr. Meyer, based upon your review of the Slidell Memorial Hospital records, the Southern Baptist Hospital records, and the electrocardiograms that you have found in the Southern Baptist records, the ones that were attached to this deposition — although this witness doesn’t know they were attached to the deposition — and the two tracings marked D-5 and D-6, what would you say is an underlying cause of the non-specific changes that you found in those electrocardiograms ?
A. “In view of the fact of the history of angina pectoris and these electro-cardiographic changes. I think one would have to assume that the condition — ”
MR. PONDER:
“One would have to assume ?”
THE WITNESS :
“One would assume that these changes reflect coronary arteriosclerosis.”
As was stated previously no written reasons were given by the trial judge for his judgment but he obviously accepted the medical testimony which established as a reasonable probability the defendant’s version, i. e. that there was no heart attack but only a manifestation of the disease arteriosclerosis and that the exertion of plaintiff neither accelerated nor aggravated this disease.
Plaintiff-appellant has cited several cases in support of his position including Bertrand v. Coal Operators Casualty Company, 253 La. 1115, 221 So.2d 816; Bernard v. Louisiana Wildlife, La.App., 152 So.2d 114 and Peppers v. Toye Bros. Yellow Cab. Co., La.App., 198 So. 177. However, these cases presume the very issue under consideration. In each of these cases there was no question as to whether there was an accident, only whether there was a causal connection between the accident and the disability. In the present case the only issue is whether or not Alford suffered an accident within the intendment of the Louisiana Compensation Act and our jurisprudence, and the trial judge obviously found that he did not suffer an accident.
In the final analysis, the only question posed for this court’s consideration is whether the finding of the trial judge was so erroneous and unsupported by the medical and other evidence adduced at the trial as to warrant a reversal by us. Any further discussion of the voluminous and tedious medical testimony would serve little purpose. The trial judge accepted the defendant’s version and our analysis of the record convinces us that the evidence preponderates in defendant-appellee’s favor and the judgment of the lower court is therefore affirmed. Appellant is to pay all costs incurred herein.
Affirmed.